Now I'm going to move to our third case of the morning, Appeal 25-1279, Wisconsin Voter Alliance et al. v. Don Millis et al. Mr. Cardall, we'll begin with oral argument from you. May it please the court, good morning. My name is Eric Cardall. I represent the Wisconsin Voter Alliance, Ron Hoyer and Kenneth Brown. This appeal is about their Article 3 standing to bring their 1983 claims in the district court. To begin, the Up America Vote Act was enacted pursuant to the elections clause by Congress to regulate state administration of federal elections, including statewide voter registration systems, related databases, voting machines, and administrative procedures. It's quite a broad law. In this case, the Wisconsin Election Commission's denials of hearings and final determinations on Wisconsin Voter Alliance HAVA administrative complaints is an actual concrete and particularized injury for the purpose of Article 3 standing. Let's unpack that a little bit. I'd like to ask you some questions, Mr. Cardall, on the different types of injuries. Injuries, in fact, that the appellants are arguing. First, actual intangible injury. Are you aware of any cases permitting standing on an actual intangible injury theory for a violation of statutory rights without an underlying express right of action? I'm aware of the case saying there's no 1983 claim to bring in this court to have a hearing and a final determination on merits of a HAVA administrative complaint. That's for the state Wisconsin Election Commission is denying us the hearing and the final adjudication. The cases that I'd refer to are cases involving interpreting statutes to see if they have a substantive right that's enforceable under 1983. There's a three-factor test. The first test is, is there an unambiguously confirmed right? And here the unambiguously conferred right is on the HAVA complainant to have a hearing and adjudication on the complaint. My question is more particular that it goes to an express right of action. Are you submitting that the right of action that would underlie a violation of statutory rights is in and of itself the Wisconsin statutory section? No, it's the federal law saying that once the complaint is filed on the request of the complainant, the government shall have a hearing on the record and make a final determination within 90 days of the complaint. So Congress chose those words to create a statutory mechanism for HAVA complainants to have a remedy under HAVA and that's federally guaranteed. That's not vague or ambiguous or amorphous. The court here listening can understand what I'm asking for, a declaratory judgment requiring Wisconsin Election Commission upon a HAVA complaint to comply with the HAVA provisions requiring a hearing on the record and an adjudication within 90 days. Also, there's an unambiguous imposition of a binding obligation on the state. The use of the word shall with respect to the hearing and with the final determination within 90 days is not discretionary. Usually, you know, this would be sufficient, but I did want to remind that Gonzaga mentions, and this is the related 1983, that you also look for a private right on a remedy. So here the private right is to file a complaint, have a hearing, and a final determination. That is the congressionally intended remedy, the way to enforce HAVA for this class of complainants. So WEC did understand what you're asking for and we do too, but you argue that the options they gave you instead, because they said, hey, we can't do this. You argue that those weren't really viable alternatives. So let me shift you there. That's great. Thank you. Can you explain why? Yeah. So when the Congress says you're going to have state administrative complaint procedures, that's the title of it is, and it says state, you're going to receive an administrative complaint and you're going to have a hearing within a certain number of days and a final determination, that's a command from Congress. And so the command of Congress through HAVA is you shall do this. And quite frankly, and I told my clients this in PUA too, that administrative complaint procedures tend to be cheaper and faster than court proceedings. So I've done these HAVA administrative complaint procedures in states like Minnesota and Pennsylvania before administrative law judges. They really go smoothly. And it's a very good thing because sometimes you're pointing out something that the government hadn't thought of. Sometimes the government agrees with you. Sometimes you learn something you didn't know. And it's a very good thing. The actual harm to the complainant is that they don't get the hearing and they don't get the final determination. And for Wisconsin Voter Alliance- Isn't that just a procedural violation though? Oh yes. Yes, that's a good question. The argument from the government misses the point that the mere procedural violation we're talking about is setting up a private right to bring an administrative complaint against state election officials of violating HAVA and a hearing and a determination within 90 days. So that's not a mere procedural violation. This is a concrete, right now I agree it's legal concrete, but nonetheless concrete. In the idea that when Congress engages in the American tradition of codifying the petition to redress the government for grievances, and it's done many times, the court knows that, the Federal Tort Claims Act, the Tucker Act, the Freedom of Information Act, Section 1983, the Driver Privacy Protection Act. But they were able to do that here. They are able to petition the government. They just don't like the government's response. But Congress codified the petition, just like in the Tort Claims Act. The Tort Claims Act, this court shall adjudicate those claims. In HAVA, this state shall administratively adjudicate these claims. So when you have a tradition, by the way Spokio mentions, this is kind of a tough case in the sense that when we're looking at whether these rights are concrete and they're actual, that history and Congress's judgment is the court's guide. So the history of the United States. Before we get there, let's talk about actual tangible standing, organizational standing. Hippocratic Alliance came down. It's got to directly interfere with core business activities. Obviously, Wisconsin Voter Alliance is an issue advocacy organization. The argument that I understand you to be making is WVA uses government processes to educate, spur into action, encourage public officials, recommend certain laws. How has that been directly interfered with by the WEC? So I think there's the core activities, educating, investigating, revealing, advocating, lobbying, and so forth. And the methodologies include communications, committee meetings. How has that been interfered with? Well, one of the tools they use, part of the tools they use in promoting their agenda is legal procedures like Open Record Act request, Freedom of Information Act request, 5.6 complaints, violation of state law, 1983 lawsuits, and HAVA complaints. And so with respect to the interference, when it's a denied, when everybody has denied a congressionally guaranteed tool, then that's an interference with Wisconsin Voter Alliance's activities. The tool here is- Let's unpack that for us because WVA has filed more complaints since these have been returned, right? I'm thinking of Mr. Huard's declaration in paragraph 52 talks about the fact that there was this complaint made about the UW Parkside situation. So WVA continues to do this, right? But again, against non-state officials, apparel in the position is that you can bring it against non-WECA complaints against non-state officials, but not the WECA officials. So what we're trying to discern is what can your client not do that it could do before? It- Because of the Wisconsin Election Commission denials of hearings and final determinations, the Wisconsin Election Commission cannot have the hearings and the final determinations that Congress guaranteed it. It's a concrete right. Congress has the power to define a private right and remedy. And when it's deprived, that's an injury. Now, injury has many consequences for the Wisconsin Voter Alliance, which we mentioned. What are those consequences? Well, if you win, then maybe things get fixed. Maybe it leads to other projects. If you lose, maybe it leads to other projects like lobbying Congress. The whole purpose of the congressional scheme was to have the state election officials put on their evidence, 52 cards on the table, and have the matters administratively adjudicated so the election process would be improved. If Wisconsin Voters Alliance won by some other means, would that not be good enough for Wisconsin Voters Alliance? So if they took the same HAVA complaint that WECA did not want to adjudicate for ethical reasons, and then they won through this other procedure or alternative that you say it's not a good enough alternative. It's an alternative, but it's not good enough for WVA. But if they won, and therefore they got a ruling that WEC violated HAVA in such and such way, and therefore WECA had to change its procedures or do something to improve the situation as a result of that ruling, whether it came through the circuit court or the district attorney or some other state administrative authority, but not WEC, would that not help WVA to achieve its concrete goals that you're discussing? Yeah, there aren't any alternatives, but I wanted that to work for WVA in that sense. We wouldn't throw that in. You're saying there are other alternatives? There are not. Those alternatives don't work. When Congress guarantees a private right to a hearing, to a final determination, and guarantees a remedy, that is the state adjudicating the HAVA complaint, that's guaranteed. And the federal courts are to interpret congressional enactments when it's on the face, shows a private right, private remedy, it's unambiguous, abiding obligation on the state, is to interpret them fairly. Let's talk about a third type of standing, this imminent tangible harm. In Huer's declaration in the gray brief, it states, Huer says, I believe that neither of the two paths the WEC suggested to be applicable, that would be referring to your complaint in the county or to the state court. Does that mean that the appellants here are not planning to pursue any of those alternative pathways? Is that correct? The appellants are waiting to resolve this 1983 complaint to see what pathway to take. This is the most efficient pathway for them, for reasons I've stated. It's cheaper, it's faster, it's better. That's why Congress created it. Your clients will not incur any costs or face any injuries from trying to pursue those pathways, will it? Absolutely, in a violation of the right we're talking about here. When Congress creates... Okay, but you're not, the clients are not claiming any actual or imminent financial injuries, correct? No, it's an intangible harm. The intangible harm is that Congress created a private right to file a HAVA administrative complaint, and the complainant has a right to a hearing, a right to information. So the imminence involves, okay, we have additional HAVA complaints we want to file against Wisconsin Election Commission. We want to use this cheaper, more effective, faster procedure. Then we have a 2022 denial, we have a 2023 denial, and then the government, Wisconsin Election Commission, is fighting vigorously. This is a vigorous defense. This is a very expensive litigation over whether they're going to have hearings and final determinations on black HAVA complaints. My question goes to imminent financial injuries. Your clients are not saying that there are imminent financial injuries as a result of the determination here, correct? Of course, it affects fundraising. These HAVA complaints are winning complaints, and we can't get them adjudicated. That's how the 501c3, we're going to get results. If you get results, you get more donations. It's like type of a business. It's just like a business. So it would interfere with fundraising, anything else that you're offering? Well, the expense, well, I went over the brief, but the expenses and so forth. But the big thing is the denial of the access to the private right and the private remedy, and that's what Congress intended. I'll reserve the time. We'll be giving you some rebuttal time, yeah. Thank you. Do you have a case that supports you on this? You say Congress has specified this right. This is the right. It shall be produced this way. Do you have a case that supports you there that does not take us into the other cases like Knight and Smith that are teaching us that people are not there to have the right to petition for their government, but not a specific response? In my view, this is fairly pedestrian with respect to the federal courts when Congress enacts a law that allows for a citizen's petition for redress of grievances and codifies it, like in the Federal Tort Claims Act, the Tucker Act, Freedom of Information Act, Section 1983, Driver Price Protection Act, all those cases. All those cases under those laws, the courts have hearings and adjudicate the claims. So it's no different with the Help America Vote Act. Congress, pursuant to the Election Clause, instructs the states, when you're doing these federal elections in your states, you must provide this type of administrative complaint procedure as the mechanism of enforcement against the states. Thank you, Mr. Cardall. We will be giving you some rebuttal time. Mr. Koski, let's move to you. Good morning, may it please the court. I have two main points today. Both relate to standing. The first is that the district court correctly held that there was no concrete injury when the plaintiffs alleged a bare procedural violation of HAVA. Judge Kirsch, I heard you in prior arguments say, what's your best case? Our best cases are Spokio, TransUnion, and Alliance for Hippocratic Medicine on standing. We believe that Spokio and TransUnion resolve the concrete injury part of the standing analysis. Those are our best cases. My second point on standing is that the claims are not redressable. The district court didn't get to this one because it didn't need to. But nonetheless, HAVA provides that HAVA claims on the merits are resolved by state tribunals, not federal courts. So when the plaintiffs were dissatisfied with how the Elections Commission disposed of their HAVA complaints, the proper place to go was through a state court judicial review. That was the procedure that was available. That was highlighted for them in the two letters they received. They, in fact, referenced Chapter 227, which is what we've highlighted in our briefs. They could have sought judicial review of the determinations that there were conflicts, and a state court judge could have determined under state law whether there were actually conflicts that prevented the commission from resolving these HAVA complaints. How often do people bring HAVA complaints against the WEC itself? Not infrequently. It does happen. Because, you know, you get the sense or, you know, WVA would not be crazy if it got the sense from the letter that WEC was kind of making it up as it goes along and trying to give them a viable alternative. Shouldn't WEC ought to have a standard process for when they receive these complaints, they're asking WEC to judge itself? Sure. And the letter actually has become standardized. So the letter they received, similar letters are going out now when there are complaints filed against- Were theirs among the first, 22, 23, 19, 20, 22, 21? It would be fair to say theirs were among the first, but these types of complaints against the agency have become more common, I'd say, in the last five years. HAVA has been around since 2002. So I think it's sort of a newer phenomenon to be doing this in the last five years or so. And, you know, we didn't talk about, or the district judge didn't address the merits of the cause of action issue. But where I started in my brief was that there's this intractable conflict that the agency has. And I raised the Caperton case because I think it highlights that you can't be the judge of your own claims against you. And Tegan says it too, although is that dicta? It is not dicta, but it is not a majority opinion. That quote is not from a majority opinion. I believe it's Justice Hagedorn's writing. But anyway, that Tegan decision did illustrate the same principle. And another court has said that the commission can't be the judge of claims against it. So with regard to the concreteness issue, I think the focus here has to be on the declarations. And what are the declarations actually say about the core objectives of the Wisconsin Voter Alliance and these individual members? And our position is that the declarations, since we're at summary judgment, do not establish a concrete injury. So what they talk about are things that Mr. Huer and Mr. Brown and WVA could do even if they don't get a decision on their HAVA complaints. So they can still engage in the issue advocacy that they want to. They can still go before the legislature and lodge these complaints. They can even lodge the complaints about the Collections Commission with the legislature. And there's nothing stopping them from doing that when they don't have decisions on these HAVA complaints. Now, I think that it could cut both ways for them. They get a decision that's favorable, they can wave it around and say, look, this is a problem. There's a problem here under HAVA. They get a decision that's negative, that could be negative for them. So I think that it can impact them, but it doesn't stop their core activities that they have highlighted in their own declarations in this case. So on that first part of the analysis on concreteness, we think they lose. On redressability, they also lose because HAVA is very clear. It is an unusual statute and that it is setting up a procedure where only state tribunals can determine federal law. It's very highlighted at the very end of his decision. What might be proper is that if an agency is receiving HAVA funds, an audit of that agency is the right remedy. And maybe that's what plaintiffs should be asking for. But under no circumstances, HAVA provide that you can go to federal court to address those claims. Now, this touches on what the district court called the cause of action part of this case. The district court didn't address that, but I want to address it because opposing counsel did address it in his reply, and I want to get a chance. So this court has never addressed whether section 1983 can be used to raise a HAVA claim. Other circuits that we've highlighted in our brief, the 11th, the 5th, 6th, have said that that is a no-go. So you cannot use section 1983 to raise a HAVA claim. And then it's almost universal in the authorities that are cited that HAVA itself cannot create a private cause of action in federal court. So those are... You've been with this argument in this whole discussion conflating Article 3 with redressability understanding, Article 3 redressability. I don't think so. I don't think it... With whether a party has a cause of action. Two different questions. I think there are two different questions, Judge Jackson-Akumi, but at the same time, in the standing analysis of redressability, it has to be considered whether there is a possibility of awarding a remedy. And under this specific scheme, there isn't. So it's very... Again, it's very unique statutory scene that Congress has set up here. I could not think of another good example of something like this. So in any event, we think that under either of those prongs of standing, this fails. And then if the court wanted to get beyond standing and go into the cause of action question, the plaintiffs also lose. And we brief that all below. If you want to see where that is in our motion to dismiss brief, which is docket entry eight at pages 26 through 29, we laid out all the authorities for this issue as well. And again, I only bring it up now because in the reply brief, it was raised for the first time. Really my focus today is standing. I want to answer any questions the court has about that issue. On organizational standing, Hippocratic Alliance has cut back Haven's Realty. Do you think that has ramifications for any of our cases? I think it definitely could. First of all, Hippocratic Medicine is directly relevant here because one of the claims in Mr. Brown's declaration is that there was diversion of resources. And Hippocratic Medicine has said that is not allowed as a basis for standing anymore. So that's gone. I'm not aware of specific Seventh Circuit cases that would be undercut by Hippocratic Medicine. But in any event, we believe that the district judge was correct in applying that case. What are the circumstances in which an organization could have standing in its own right after Hippocratic Alliance? Well, I think that if they could show one of the intangible harms that Spokio or TransUnion actually discussed. So for example, they talk about the tangible harms are monetary or property related. If they could show harms like, I think one of them is harm to reputation is one of the ones that Spokio talks about. So if they could show some of the intangible harms that Spokio and TransUnion actually laid out, that would be a good example. Why is when Mr. Cardall, excuse me if I mispronounce it, says we can't get donations because we don't have a WC decision on our HAVA complaint. Why would that not fall into that lane? I think that falls into the Hippocratic Medicine case directly, is directly controlled by that. That specifically said that if an organization is claiming that it's spending funds to advocate against something. That's him saying we can't get donations because we're not producing the results we promised supporters and would be supporters. That's not for spending. Judge, I think this is kind of hypothetical. I don't think it actually alleges that in their declarations. So I don't recall it actually alleging that. And if it did, that would be different issue. So I think that number one, my position is Hippocratic Medicine does address that claim about funds diversion and loss of opportunity for use of funds. But the second part of it is that's not part of this case. They don't make those allegations. They only talk about diverting funds in their declarations. And again, we're on summary judgment. We have to focus on what's actually in the record. With regard, I want to segue into the First Amendment claim because the court has already picked up on it, the redress of grievances claim. As we've shown in our briefing, the Knight case, Smith, the operating engineers case, the 2020 case from this court, the Hilton case, all of those cases do not support their First Amendment theory. So they had two constitutional theories. One was due process. The other was First Amendment redress of grievances. They in their opening brief in footnote two say, no, we can't do the due process claim. We acknowledge that. So they have not pursued that further. They're still pursuing the First Amendment redress of grievances claim. But as we pointed out, that one is again, a no-go. That doesn't go anywhere. They can still petition for redress of grievances. And if they get responses they don't like, that doesn't offend the First Amendment. So we believe that that is not a viable intangible harm claim that can create the standing they need for the concreteness injury or the concreteness part of the standing inquiry. That just is not going to do it. I think I've addressed what I want to today about standing it. So I want to give the court a chance to answer any questions. Otherwise, I will see back the remainder of my time. Nothing further. Thank you, Mr. Cross. Thank you, Your Honors. Thank you. We'll move now, Mr. Cardall, back to you for two minutes of rebuttal. As it goes, the determination of harm is determined by Congress. So Congress determined the harm was the state officials at WECC violating HAVA. They create a private right for a person to go into an administrative tribunal and to make a complaint saying that that harm is occurring. And the remedy is an order to stop the harm from occurring. And the harm is? The violation of HAVA. All of these various standing doctrines are asking for something that would explicate or explain what that harm is to your clients. This is your opportunity, Mr. Cardall, to tell us how WVA and Brown and Hewer were harmed. Right. Talk a little bit about fundraising. So Congress gets to decide the harm that's regulating. Congress said violating HAVA is a harm. The citizen can make a complaint and have a hearing and adjudicate that harm. Congress gets to do that. Nothing we do on the standing doctrine can take away Congress's decision that there's a right to sue. There's a right to a hearing. There's right to a remedy to address that harm. And the harm is the Wisconsin Election Commission officials violating HAVA. So that's HAVA. This is the statutory mechanism for enforcing HAVA. And here the Wisconsin Election Commission is saying we're not going to follow that law. But the court, the federal court, has to follow the law. And the court has to find a way to give life to the statutory mechanism provided to enforce HAVA against the Wisconsin Election Commission officials. And the way to give life to it is to apply spokios I talked about and see that there's a private right to sue, bring an administrative complaint, to give the hearing. There's a remedy for the adjudication. And what Congress is addressing was the harm of the Wisconsin Election Commission doing that. Can I make one last note? Based on the Wisconsin Election Commission arguments, the state law binds them from adjudicating the complaints against the state election officials. It appears the Wisconsin state laws violates HAVA. So it's not, they're saying it's not their policy. It's the state statute that says we can't adjudicate administrative complaints against state election officials. Nothing could be more horribly contradictory to the Help America Vote Act provision for administrative complaint procedures than Wisconsin Election Commission's argument today. Thank you. Thank you, Mr. Cardall. Thank you, Mr. Kroski. The case will be taken under advisement.